## OREND, JR. v OREND

Common Pleas Court, Mahoning Co.

No. 103618. Decided Jan. 6, 1940

Harry T. Rapport, Youngstown, for plaintiff.

H. P. McCoy, Youngstown, for defendant.

## OPINION

By BECKENBACH, J.

The plaintiff in the above entitled cause filed his petition on the 16th day of September, 1938, in which among other things he alleges that plaintiff and defendant were married on the 28th day of November, 1936 in Youngstown, Ohio; that on the 10th day of October, 1937 the plaintiff and defendant separated and that at no time after the 10th day of October, 1937 has the plaintiff had sexual relations with the defendant and that on August 29th, 1938 defendant gave birth to a male child. In his prayer he requests that a divorce be granted to him on the ground of adultery because he is not the father of said child.

The defendant after leave of Court was first had, filed an answer to the petition on the 20th day of October, 1938 in which among other things she admits that plaintiff and defendant did not have marital relations since the 10th day of October, 1937 and that on August 29th, 1938 defendant gave birth to a male child.

The pleadings in this cause clearly define the issue for the Court which is: Is the plaintiff the father of the child born to the defendant on the 29th day of August, 1938?

The defendant admitted on cross examination that she menstruated on the 22nd day of November, 1937 and

Dr. Paul Kaufman, a defense witness, testified that she also menstruated a day or so in December.

The evidence further discloses that the male child, which was born on August 29, 1938, weighed 6 pounds 12½ ounces and that that weight is the normal or average weight or slightly less than the average weight for a child born as a result of a normal period of gestation, which is about 280 days. Defendant testified that her health had been pretty good. Dr. Ranz testified that the spermatozoa of the male does not live in the vagina of a normal woman longer than 18 hours to the longest that has ever been found, seven days. The expert medical testimony clearly, convincingly and conclusively shows that a child born as a result of a prolonged period of gestation would be overly developed and would weigh more than a child born as a result of an average or normal period and that the skin would be wrinkled. Upon cross examination of counsel for the plaintiff Dr. Paul Kaufman, who attended the defendant during her confinement, testified that he did not remember anything unusual about the child's skin condition.

It was agreed by counsel and made a part of the record of the proceedings that Dr. O. W. Haulman examined the defendant on March 9th, 1938 and that his findings were that she was 3½ to 4 months pregnant and that her baby was due August 29, 1938.

Dr. Banninga was asked in substance the following question: Assuming that on October 10th, 1937 husband and wife separated, on March 9th, 1938 wife has been examined by a physician and that a finding was made by him that the wife was 3½ to 4 months pregnant and that her last menstrual period was November 22, 1937, that the doctor's finding further was that her baby was to arrive on August 29th, 1938, are you able to give your opinion as to, with reasonable certainty, whether or not the husband was the father of that child? His answer was, "If there had been no intercourse after October 10th, 1937, I would say, that the child

could not be the child of her husband."

Dr. Ranz was asked approximately the same question and his answer was, "My opinion would be that this man was not responsible for that pregnancy, unless he. had sexual relations later." (Referring to October 10, 1937).

Dr. Williams of Johns Hopkins Hospital, an authority on the subject of obstetrics in his. book was quoted as saying, "Pregnancy may last for a long period and I recall a patient who on two occasions did not go into labor until considerably over 11 months after the last period, in both instances the children weighed over twelve pounds, were 55 centimeters in length and presented marked increased thoracic measurements." Dr. Banninga further testified under cross examination that, "Williams takes every case of actual prolonged pregnancy and the child is larger and the skin shows that it has been in the womb longer, but any doctor who is skilled in the examination of a pregnant woman can examine the height of the same and tell from that when the pregnancy will terminate normally." Upon further cross-examination Dr. Banninga testified in referring to the defendant, "She must have had intercourse after October 10th."

Dr. Ranz testified that a child who is in the womb a long period of time is an enormous child, and in one experience he had the child weighed 14 pounds, but that any child that weighed six and one-half to seven pounds is not the result. of a prolonged pregnancy.

Dr. Paul Kaufman who was the only expert witness called by the defense testified on cross-examination that he had never read of a case in which a child of normal weight was born as a result of a long period of gestation and also that he had never had in his experience a case of that type. Yet he testified that in his opinion the plaintiff could be the father of that child. The total number of days between October 19, 1937 and August 29, 1938 is 323 days and it was emphatically stated through expert testimony that although

there are a few cases on record in which the period of gestation lasted that long, the children were never of normal weight and that they were always overly developed and the skin would be wrinkled.

The Court has spent much time in analyzing the evidence and in a research of the law and tried hard to justify a finding of legitimacy, realizing with what tremendous handicap an innocent child is burdened, to be labeled all of his life an illegitimate one.

In contested divorce cases both plaintiff and defendant are usually represented by counsel and when there are children involved they too often become incidental to the issue in the main. The Court, however, very strongly feels that where children are involved the Court represents the welfare of those children and throws around them a cloak of protection. The best interest of the children is usually the best interest of society and the law of Ohio therefore raises a strong presumption that children born during wedlock are legitimate, however, this presumption may be rebutted by clear, certain and conclusive proof that the contrary is true.

This Court in coming to his decision reflected on what the outcome of this law suit would be if it were a bastardy proceeding in which the plaintiff was being charged with being the father of a child born to the defendant out of wedlock. The court under those circumstances would come to but one conclusion and that is that he could not possibly have been the father of that child.

There has been much expert medical testimony presented to the Court in this case and that testimony clearly, certainly and conclusively proves: that the child cannot be the child of the plaintiff.

The presumption of legitimacy during wedlock is one based upon a presumption of accessibility of the husband to the wife and it has been wisely held that even where the wife was a loose woman during her marriage if the

husband had access to her and a child was born it was presumed to be his.

In this case it was stated by the plaintiff and admitted by the defendant that the last time they had sexual relations was on October 10th, 1937 and that a male child was born 323 days later. The question of accessibility does not come up in this case because of the admission of the defendant that there was no access after that date. The question becomes purely and simply a medical one in which it is up to the Court to decide as a result of all the medical testimony presented whether or not a child born weighing 6 pounds 12½ ounces, who would have normal or less than normal weight and development, whose skin was unwrinkled and born 323 days after conception, would be within the realm of possibility.

The Court feels as a result of analyzing the medical testimony that if the spermatozoa could remain within the vagina of a normal, healthy woman for the length of time which is the difference between a normal birth of about 280 days and the 323 days, which is 43 days, without becoming sterile, that it would be possible, but under the circumstances in this case Dr. Ranz, a reputable physician, testified that this would be physically impossible and there is no evidence in this case refuting his statement.

In **Sec. 40, page 589 of 5 O. Jur.** it is stated:

"Before such a child can be adjudged a bastard proof must be clear, certain and conclusive either that the husband had no power of procreation or the circumstances were such to render it impossible that he could be the father of the child."

In discussing bastardy **5 O. Jur., Sec. 47,** states:

"However, it has been recently held that when, stated in the Court of Appeals for circumstances in a case, the non-accessibility by the husband is clearly inferable the presumption of the paternity of the husband is overcome."

As stated before the admission of the plaintiff and the defendant that there was no access after the 10th day of October, 1937 clearly wipes out any presumption of access. As stated in **7 Corpus Juris at page 946, under subhead 85 B.**

"The presumption of access from opportunity is not conclusive but may be rebutted by evidence tending to show non-accessibility."

This Court agrees with counsel for the defense that many of the circumstances surrounding the birth of a child are still a mystery to medical science, however, where the medical testimony is so definite as it is in this case this Court reluctantly must conclude that the child born to the defendant on August 29th, 1938 could not possibly be the child of the plaintiff.

In ruling that the child born to the defendant is not the child of the plaintiff this Court must then of necessity rule that the defendant has been guilty of adulterous conduct with a person unknown, even though the plaintiff tried to tie-up the adulterous conduct with a known individual he was unable to prove the fact with the degree of proof necessary.

**Sec. 11993 GC** which is headed, "Divorce for Aggression of the Wife", states:

"When the divorce is granted by reason of the aggression of the wife the Court may adjudge to her such a share of the husband's real and personal property, or both, as it deems just."

This Court is very firmly of the opinion that even though a divorce is granted at the aggression of the wife that she should not be turned out in the world without an opportunity of living a normal life. This Court does not feel that she should be thrown into a life of prostitution which might be the result if she were cut off without sufficient money with which to acquire

a new start in life. The Court especially feels that way in this case, wherein, the defendant very frankly and openly admitted that her last relations with her husband was October 10, 1937. and because there had been no evidence whatsoever of any adulterous conduct other than the fact that 323 days after her last intercourse with her husband a child was born.

It would seem to this Court that justice would require that it be the duty of the plaintiff to give to ██ the defendant an opportunity to rehabilitate herself and reestablish her life. Out of the martial relationship which has existed since 1936 there should evolve even upon dissolution of that marriage, a duty upon the husband, who is the breadwinner in this case, to give his wife an opportunity to start her life anew.

In Wright's Reports in the case of Dailey v Dailey in the syllabus, at page 514 the Court says,

"When a divorce is decreed for a single act of adultery in the wife, and there is no hope of reclamation, and the property was earned by the parties in wedlock, alimony will be allowed, for the wife must not be turned loose to prostitution or starvation."

The Court feels in this case as the Court did in the case just cited, that the wife, "must not be turned loose to prostitution or starvation", and for that reason this Court is of the opinion that she should be allowed $500.00 with which to reestablish herself in life and out of which she is to pay reasonable attorney fees.

This Court further concludes that the plaintiff is entitled to a divorce from the bonds of matrimony as prayed for in his petition and that he shall pay all of the Court costs.